IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

DANNY J. BRYANT,    )
           )
    Plaintiff,   )
           )
           )  CIV-09-1005-D
v.          )
           )
MICHAEL J. ASTRUE,    )
  COMMISSIONER OF SOCIAL )
  SECURITY ADMIN.,   )
           )
    Defendant.  )

REPORT AND RECOMMENDATION

   Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of

Defendant Commissioner denying his concurrent applications for disability insurance

benefits ("DIB") and supplemental security income benefits ("SSIB") under Titles II and

XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1382. Defendant has answered the

Complaint and filed the administrative record (hereinafter TR___), and the parties have

briefed the issues. The matter has been referred to the undersigned Magistrate Judge for

initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). For the following reasons, it

is recommended that the Commissioner's decision be affirmed.          .

I. <u>Background</u>

Plaintiff filed his applications for benefits on February 22, 2007, and alleged in the applications that he became disabled on November 30, 2005. (TR 79-90). Plaintiff later amended the onset date to August 7, 2005. (TR 381). Plaintiff alleged disability due to heart disease, diabetes, hypertension, poor eyesight, fatigue, obesity, headaches, dizziness, diabetic retinopathy, side effects fo medication, and chest pain. (TR 109). Plaintiff alleged that he stopped working on November 30, 2005, because of his impairments. (TR 109). He described a twelfth grade education and previous jobs as a security guard, "tail gunner" for a shock manufacturer, and "wet dryer" for a carpet manufacturer. (TR 110, 116). With respect to his usual daily activities, Plaintiff stated in March 2007 that he took care of his personal needs, cooked one meal per day, performed no house or yard work, did not drive because his license was suspended, shopped in stores once a week, watched television and read every day, and socialized with others by telephone or computer four or five times a week. (TR 129-133). Plaintiff estimated he could walk one block before stopping to rest for 10 to 15 minutes, and he stated he had difficulty with stress, had difficulty with lifting or squatting due to back pain, had difficulty with bending, walking, and kneeling due to "dizzy spells," and had difficulty with stair climbing due to fatigue and poor vision, although he wore eyeglasses. (TR 134-135). In June 2007, Plaintiff described chest pain beginning 7 to 8 months previously, occurring "off and on" every day, and relieved by lying down. (TR137-139).

Plaintiff's applications were denied at the initial and reconsideration stages of administrative review. (TR 32-35). At Plaintiff's request, a hearing *de novo* was conducted before Administrative Law Judge Wampler ("ALJ") on October 6, 2008. (TR 19-31). Plaintiff testified that he has chest pain with stress and walking. (TR 21-22). He testified that he walked, did not drive, and that "doctors [told] me that I could walk." (TR 22). He testified that the chest pain resolved in two or three minutes with rest and that he did not take medication for chest pain. (TR 22). Plaintiff also testified that he had fatigue "quite often" because of sleep apnea and the medications he was taking. (TR 22-23). He testified he was unable to stay awake during the day, constantly felt drowsy, and slept "five to six hours" during the daytime. (TR 23-24). Plaintiff stated that he could walk a block and a half before he had to sit down and rest due to chest pain and fatigue. (TR 24). He stated that he had difficulty with stair climbing because of poor vision. (TR 25). Plaintiff estimated he could stand for 30 to 45 minutes before he became fatigued and his legs and back began to bother him. (TR 25). Plaintiff testified that sitting for too long caused him to "get tired and fall asleep." (TR 26). Plaintiff stated that he lived with his parents, did not perform any household chores, and did not have any hobbies. (TR 26-27).

The ALJ issued a decision on November 8, 2008, in which the ALJ found that Plaintiff had severe impairments due to hypertension, obesity, non-insulin dependent diabetes mellitus, coronary artery disease, and status post multiple myocardial infarctions and stent placements. (TR 13). The ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act, and the Appeals Council declined to review the decision. (TR 1-4,

11-18).  Plaintiff now seeks judicial review of the final decision of the Commissioner, which is reflected in the ALJ's decision.

II. Standard of Review

Judicial review of this action is limited to determining whether the Commissioner's decision is based upon substantial evidence and whether the correct legal standards were applied.  Emory v. Sullivan, 936 F.2d 1092, 1093 (10th Cir. 1991).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992).  Because "all the ALJ's required findings must be supported by substantial evidence," Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999), the ALJ must "discuss[ ] the evidence supporting [the] decision" and must also "discuss the uncontroverted evidence [the ALJ] chooses not to rely upon, as well as significantly probative evidence [the ALJ] rejects."  Clifton v. Chater, 79 F.3d 1007, 1010 (10th Cir. 1996).  The court may not reweigh the evidence or substitute its judgment for that of the Commissioner.  Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1498 (10th Cir. 1992).  However, the court must "meticulously examine the record" in order to determine whether the evidence in support of the Commissioner's decision is substantial, "taking into account whatever in the record fairly detracts from its weight."  Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004)(internal quotation omitted).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i), 1382c(a)(3)(A). The Commissioner applies a five-step inquiry to determine whether a claimant is disabled. See 20 C.F.R. §§ 404.1520(b)-(f), 416.920(b)-(f) (2009); see also Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005)(describing five steps in detail). Where a *prima facie* showing is made that the plaintiff has one or more severe impairments and can no longer engage in prior work activity, "the burden of proof shifts to the Commissioner at step five to show that the claimant retains sufficient residual functional capacity (RFC) to perform work in the national economy, given [the claimant's] age, education, and work experience." Grogan, 399 F.3d at 1261; accord, Channel v. Heckler, 747 F.2d 577, 579 (10th Cir. 1984).

III. Step Three

Plaintiff contends that the ALJ erred in failing to order a consultative cardiac exercise test in connection with the step three determination concerning Plaintiff's coronary artery disease. Plaintiff further contends that there is not substantial evidence to support the ALJ's finding that he is not disabled *per se* under the agency's Listing of Impairments for coronary artery disease.

At the third step of the requisite sequential evaluation procedure, the ALJ "determines whether the impairment is equivalent to one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity," pursuant to 20 C.F.R. §§ 404.1520(d), 416.920(d) (2009). Bowen, 482 U.S. at 141. "If the impairment meets or equals one of the listed impairments, the claimant is conclusively

presumed to be disabled." Id.  The listing for ischemic heart disease can be satisfied by

> symptoms due to myocardial ischemia . . . while on a regimen
> of prescribed treatment . . ., with one of the following: A. Sign-
> or symptom-limited exercise tolerance test demonstrating at
> least one of [four specific] manifestations at a workload
> equivalent to 5 METs or less: . . . OR B. Three separate
> ischemic episodes, each requiring revascularization or not
> amenable to revascularization . . . within a consecutive 12-
> month period . . . OR C. Coronary artery disease, demonstrated
> by angiography (obtained independent of Social Security
> disability evaluation) or other appropriate medically acceptable
> imaging, and in the absence of a timely exercise tolerance test
> or a timely normal drug-induced stress test, an MC, preferably
> one experienced in the care of patients with cardiovascular
> disease, has concluded that performance of exercise tolerance
> testing would present a significant risk to the individual, with
> both 1 and 2: 1. Angiographic evidence showing [one of five
> specific findings of narrowing of arteries or vessels; and 2.
> Resulting in very serious limitations in the ability to
> independently initiate, sustain, or complete activities of daily
> living.

20 C.F.R. pt. 404, subpt. P, app. 1, § 4.04.

The record contains the results of electrocardiograms of Plaintiff conducted on March 12, 1999, August 23, 2001, October 18, 2004, and August 7, 2005. (TR 187-191).  All of these tests were interpreted as abnormal. The medical record shows that Plaintiff was hospitalized with a myocardial infarction in August 2005. (TR 180-181).  Plaintiff gave a medical history of a previous heart attack and the placement of multiple stents approximately eight years previously. (TR 180).  The examining physician noted that Plaintiff had been noncompliant with his hypertension medications for several months. (TR 180).  Two stents were successfully placed to repair blockages, and at a follow-up examination conducted by

the treating cardiologist, Dr. Valuck, in September 2005, Plaintiff denied chest pain and exhibited no edema. He described some dizziness, and the physician related this to "malignant" hypertension for which he prescribed a "quadruple[d]" dosage of hypertension medication. (TR 192-193). At a second follow-up examination conducted by Dr. Valuck in January 2006, the physician noted that Plaintiff was in custody for the offense of distribution of methamphetamine. (TR 194). Dr. Valuck noted Plaintiff's hypertension was improved and that Plaintiff's complaint of dizziness upon standing was related to his hypertension. His five cardiac and hypertension medications were refilled, and Dr. Valuck prescribed an anti-anxiety medication. (TR 194-195).

Records of the Oklahoma Department of Corrections show that Plaintiff was incarcerated in May 2006. At a medical assessment following his admission to prison, Plaintiff provided a medical history of myocardial infarctions in 1999 and 2005 and the placement of four cardiac stents. (TR 214, 237). In July 2006, an examining physician's assistant noted Plaintiff was taking five medications for coronary artery disease, hypertension, and non-insulin dependent diabetes. (TR 237). The examiner also noted that Plaintiff did not exhibit neuropathy in his feet. (TR 237). In January 2007, Plaintiff complained of headaches and some dizziness, which he described as a "spinning sensation just when [he] move[d] quickly." (TR 205). The examining physician noted Plaintiff had benign postural vertigo and that his headaches could be due to nitroglygerin. (TR 205). He was also prescribed medication for low back pain. (TR 205). At another examination on January 31, 2007, Plaintiff reported he was doing well and had no problems except for some

daily chest pain. His medications were adjusted for hypertension in "poor control" and coronary artery disease. (TR 204). Plaintiff was discharged from custody on February 13, 2007, with prescriptions for six medications. (TR 203).

At a consultative evaluation conducted by Dr. Hall in April 2007, Plaintiff reported that he had been discharged from custody in February 2007 and that he was not taking his prescribed medications. (TR 260). Dr. Hall noted that Plaintiff's blood pressure reading was 225/140 and that she offered to call an ambulance to transport Plaintiff for emergency medical treatment, but he declined. (TR 260). A physical examination was normal except for some decreased hip flexion, and the diagnosis was coronary artery disease and uncontrolled hypertension. (TR 261).

In December 2007, Plaintiff suffered another myocardial infarction, and he was diagnosed with severe single vessel coronary artery disease and uncontrolled diabetes. (TR 287). The examining physician noted Plaintiff had been "off several med[ications] with uncontrolled diabetes." (TR 287). Another stent was successfully placed to repair the blockage.

Following the established administrative evaluation procedure, the ALJ found at step three that Plaintiff's coronary artery disease was not disabling *per se* under the agency's Listing of Impairments at 20 C.F.R. pt. 404, subpt. P, app. 2, § 4.04. The ALJ reasoned that Plaintiff did "not have the degree of occlusion or the findings on stress tests to meet the requirements of Section 4.04." (TR 14). Plaintiff contends that the ALJ erred by failing to develop the record with a consultative treadmill test before determining that Plaintiff failed

to meet the requirements of the listing. Plaintiff contends that the ALJ "conceded that Mr. Bryant would have met the listing if he had test results from the exertion testing" and that Plaintiff informed the ALJ in a brief submitted to the agency before the hearing that Plaintiff's insurance would not cover the treadmill testing. Plaintiff's Opening Brief, at 11. Plaintiff contends that he filed new applications for DIB and SSIB benefits in July 2009, and at the initial stage of consideration the agency awarded Plaintiff benefits due to ischemic heart disease and diabetes mellitus beginning April 1, 2009. Plaintiff's Opening Brief, Attachments A, B. Plaintiff contends that his medical condition remained the same during the agency's consideration of the applications under review and his most recent applications, but the agency obtained consultative echocardiogram and resting doppler studies in connection with his most recent applications.

Defendant responds that the ALJ did not err by failing to develop the record with consultative treadmill testing. Defendant asserts that Plaintiff's severe arterial hypertension reading at his consultative evaluation indicated that exercise testing would pose a risk to Plaintiff's health, and therefore the ALJ "properly did not schedule Plaintiff for an exercise stress test." Defendant's Brief, at 6. With respect to Plaintiff's subsequent applications and receipt of disability benefits, Defendant responds that (1) the relevant period for determination is from August 5, 2005, Plaintiff's alleged disability onset date, through November 5, 2008, the date of the ALJ's decision, and (2) Plaintiff was awarded benefits beginning April 1, 2009, based on the finding that his cardiac impairment satisfied the listing for chronic heart failure due to an October 2009 echocardiogram showing a left ventricular

ejection fraction of 20 %.   Defendant points out that the October 2009 cardiac testing reflected a worsening of Plaintiff's heart disease because an earlier angiogram conducted during the relevant period in December 2007 showed left ventricular ejection fraction of 50%. (TR 283-284).

The regulations provide that the agency

> will consider whether to purchase an exercise test when: (i) There is a question whether [the claimant's] cardiovascular impairment meets or medically equals the severity of one of the listings, or there is no timely test in the evidence we have . . ., and we cannot find [the claimant] disabled on some other basis; or (ii) We need to assess your residual functional capacity and there is insufficient evidence in the record to make a determination or decision.

20 C.F.R. pt. 404, subpt. P, app. 1, § 4.00 (C)(6).

"The ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." Henrie v. United States Dep't of Health and Human Servs., 13 F.3d 359, 360-361 (10th Cir. 1993).  It is not the ALJ's duty, however, to be the claimant's advocate, and "the ultimate burden of proving that [the claimant] is disabled under the regulations" is borne by the claimant. Id. at 361.  "Ordinarily, the claimant must in some fashion raise the issue sought to be developed which, on its face, must be substantial.  Specifically, the claimant has the burden to make sure there is, in the record, evidence sufficient to suggest a reasonable possibility that a severe impairment exists." Flaherty v. Astrue, 515 F.3d 1067, 1071 (10th Cir. 2007)(quotation omitted).

Even though the ALJ did not express consideration of the need for ordering a consultative exercise cardiac test (and the Commissioner's post-hoc justification is not considered because it does not appear in the ALJ's decision), the record contained angiography test results during the relevant time period that showed Plaintiff's impairment did not satisfy the requirements of the listing for heart disease. 20 C.F.R. pt. 404, subpt. P, app. 1, § 4.04 (C). The angiogram results provided the ALJ a "timely test in the evidence" and the record provided sufficient evidence for ascertaining Plaintiff's residual functional capacity ("RFC") for work. Therefore, the ALJ was not required by 20 C.F.R. pt. 404, subpt. P, app. 1, § 4.00(C)(6), to order consultative cardiac exercise testing.

As Defendant aptly points out, Plaintiff's subsequent applications filed in July 2009 provide no support for his claim of disability for the period between August 7, 2005, his alleged disability onset date, and November 5, 2008, the date of the ALJ's decision concerning the applications under review. It is uncontroverted that the finding of disability in the subsequent administrative proceeding was based on cardiac test results that were not performed during the relevant time period and which reflected a worsening of Plaintiff's cardiac impairment. No error occurred in this regard, and there was substantial evidence in the record to support the ALJ's finding that Plaintiff's cardiac impairment was not severe enough to satisfy the listing for ischemic heart disease.

IV. Step Five - Reliance on the Grids

The ALJ found at step four that Plaintiff had the RFC to perform work at the sedentary exertional level. (TR 15). The ALJ found that Plaintiff's RFC was limited by

11

additional restrictions of occasional climbing, balancing, stooping, kneeling, crouching and crawling, no work at unprotected heights or around hazardous machinery, no work in extreme temperatures, no climbing on ladders, ropes or scaffold, and avoidance of work requiring driving. (TR 15). The ALJ found that this RFC for work precluded the performance of Plaintiff's previous jobs. At step five, the ALJ found that the "additional limitations" placed on Plaintiff's RFC for sedentary work had "little or no effect on the occupational base of unskilled sedentary work." (TR 17). In light of Plaintiff's RFC and vocational characteristics, the ALJ concluded that he was not disabled based on the framework provided in the grids at Rule 201.28 and Rule 201.21. (TR 17).

Plaintiff contends that the ALJ erred in relying on the grids to determine whether or not Plaintiff was disabled at step five because Plaintiff's nonexertional limitations due to pain precluded reliance on the grids. At the fifth and final step of the requisite sequential evaluation process, the burden shifts to the Commissioner "to show that the claimant retains sufficient RFC . . . to perform work in the national economy, given [his] age, education and work experience." Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007)(internal quotation and citation omitted).

The Social Security Administration has adopted Medical-Vocational Guidelines, commonly known as grids, which are applied to determine whether a claimant is disabled based on his or her RFC category, age, education, and work experience. See 20 C.F.R. pt. 404, subpt. P, app. 2. In some instances, the grids can be used to satisfy the Commissioner's burden of proof at the fifth step of the sequential evaluation process. "The grids should not

be applied conclusively in a particular case, however, unless the claimant [can] perform the full range of work required of that RFC category on a daily basis and unless the claimant possesses the physical capacities to perform most of the jobs in that range." <u>Hargis v. Sullivan</u>, 945 F.2d 1482, 1490 (10th Cir. 1991). If a claimant has pain that "interfere[s] with the ability to work" then reliance on the grids is foreclosed, and in those circumstances the grids may be used only as a framework to determine whether sufficient jobs can be performed within the claimant's RFC. <u>Thompson v. Sullivan</u>, 987 F.2d 1482, 1488 (10th Cir. 1993).

Citing <u>Trimiar v. Sullivan</u>, 966 F.2d 1326 (10th Cir. 1992), Plaintiff contends that the ALJ erred by failing to determine whether there were a significant number of jobs available that Plaintiff could perform. In <u>Trimiar</u>, the Tenth Circuit Court of Appeals addressed the issue of what factors should be considered by an ALJ in determining whether work exists in significant numbers in making a step five determination. <u>Id.</u> at 1330-1332. This discussion in <u>Trimiar</u> has no application in a step five determination in which the ALJ relied on the grids. "The grids set forth presumptions regarding whether jobs exist in significant numbers in the national economy given the particular limitations possessed by the claimant." <u>Id.</u> at 1332. Plaintiff next contends that the ALJ erred in relying on the grids in the face of Plaintiff's nonexertional limitations. The grids "consider only the exertional limits of the individual," and "[e]ach residual function category [in the grids] considers a full occupational base, or the number of jobs available in the national economy, that the claimant can perform within his range of exertional capacity." <u>Id.</u> at 1333 n. 23.

"Where individuals also have nonexertional limitations of function or environmental restrictions, the [grid] rules provide a framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs within these exertional ranges that would be contraindicated by the additional limitations or restrictions." Social Security Rules 85-15, <u>Titles II and XVI: Capability to Do Other Work - The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments</u>, 1985 WL 56857, *1. When nonexertional limitations are present, vocational expert testimony is generally required to determine whether jobs exist for someone with the claimant's precise impairments. <u>Trimiar</u>, 966 F.2d at 1333.

The ALJ specifically found that the nonexertional limitations ascribed to Plaintiff in the RFC determination had little or no impact on the occupational base for the full range of sedentary work. In a ruling that provides guidance in this situation, the agency has explained that "[m]ost sedentary jobs require good use of the hands and fingers. . . . Relatively few jobs in the national economy require ascending or descending ladders and scaffolding. . . . [T]o perform substantially all of the exertional requirements of most sedentary and light jobs, a person would not need to crouch and would need to stoop only occasionally (from very little up to one-third of the time) depending on the particular job." Social Security Ruling 83-14, <u>Titles II and XVI: Capability To Do Other Work - The Medical-Vocational Rules as a Framework for Evaluating a Combination of Exertional and Nonexertional Impairments</u>, 1983 WL 31254, *2. Thus, as the agency recognized in another ruling, "[p]ostural limitations or restrictions related to such activities as climbing ladders, ropes, or scaffolds,

balancing, kneeling, crouching, or crawling would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work." Social Security Ruling 96-9p, Titles II and XVI: Determining Capability To Do Other Work - - Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work, 1996 WL 374185, * 7. Additionally, "few occupations in the unskilled sedentary occupational base require work in environments with extreme cold, extreme heat, wetness, humidity, vibration, or unusual hazards." Id. at * 9.

The ALJ appropriately used the grids as a framework for decisionmaking in the face of the nonexertional limitations restricting Plaintiff's RFC for sedentary work. The nonexertional limitations found by the ALJ did not significantly erode the sedentary occupational base such that the grids could not be used in this manner to support the Commissioner's step five decision. The grids, specifically Rule 201.28 (for younger individuals aged 18-44) and Rule 201.21 (for younger individuals aged 45-49), provide substantial evidence to support the Commissioner's decision. Therefore, the Commissioner's decision should be affirmed.

## RECOMMENDATION

In view of the foregoing findings, it is recommended that judgment enter AFFIRMING the decision of the Commissioner to deny Plaintiff's applications for benefits. The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before _____August 22nd_____,

2010, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The failure to timely object to this Report and Recommendation would waive appellate review of the recommended ruling. <u>Moore v. United States</u>, 950 F.2d 656 (10th Cir. 1991); <u>cf.</u> <u>Marshall v. Chater</u>, 75 F.3d 1421, 1426 (10th Cir. 1996)("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this _____2nd_____ day of ____August_____, 2010.

GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE